Filed 7/16/21  Giacometti v. Puls Technologies CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SIMONE GIACOMETTI, | D077232 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2017-00041466-CU-BC-CTL) |
| PULS TECHNOLOGIES, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

Tauler Smith and Robert Tauler for Plaintiff and Appellant.

Buchalter, Tracy A. Warren, Kathryn B. Fox, and Robert M. Dato for Defendants and Respondents.

Simone Giacometti appeals from the judgment entered against him after a trial in which the jury rejected his claims for intentional misrepresentation and false promise against Puls Technologies, Inc. and its founder Itai Hirsch (collectively Puls).  Giacometti also challenges the trial

court's prior order granting Puls's motion for summary adjudication of Giacometti's claim for breach of contract.

Giacometti contends there were triable issues of fact on his claim for breach of contract that should have reached the jury. He also argues the special verdict form submitted to the jury contained an erroneous statement of the law with respect to his claim for intentional misrepresentation. As we shall explain, we reject these arguments and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Puls, at the time of the relevant events called CellSavers, is a company that sends technicians to its customers' locations to repair or install various types of equipment and devices. The company's initial concept was to send a technician to a customer's home or office to repair broken cell phones. Puls eventually expanded its business to include other types of equipment like appliances and televisions. Hirsch founded the company in January 2015. In April of that year, Puls hired Giacometti's company, Vedilo, Inc. (Vedilo), to provide marketing services at a rate of $349 per week.

Around the time Puls engaged Vedilo, Hirsch was seeking a Chief Technology Officer (CTO) for Puls. Hirsch sent an email to several people, including Giacometti, seeking leads on potential candidates to fill the role. Giacometti responded immediately to the email, expressing interest in the position.

Hirsch pursued hiring Giacometti on an interim basis and on May 20, 2015, after discussions over the phone and on Google chat, sent Giacometti an email with the subject line "New Agreement LOI."[1] The email stated, "Hey Simone, [¶] I wanted to quickly sum up our call from today in this

---

[1] During his trial testimony, Hirsch explained LOI stood for letter of intent.

2

email. [¶] You will join CellSavers as a technical manager/temp CTO. [¶] For your services the compensation will be as follow[s]: [¶] 1. $750 a week for a period of 12 weeks. [¶] 2. $150,000 worth of stocks converted into equity once the first seed round is completed. [¶] We will reevaluate the terms after the 12 weeks is over. The official starting day is 5.25.15[.] [¶] My attorney will prepare the agreement within a week. [¶] Good luck to us!"

Minutes later, Giacometti responded by email "Thanks for summarizing things. Don't forget the Vedilo social media, it doesn't have to be in the agreement though as it is separate." Hirsch wrote back, "I thought we are doing the social media with the deal? since $2700+500 is $3250. Am I wrong?" Hirsch testified at trial that after this exchange, Giacometti asked for more money and that there were "constant negotiations for the next ten weeks" over the terms of employment, with Giacometti seeking "more money, faster vesting, more considerations." Giacometti testified at trial that he knew after receiving the LOI email that a written agreement would be forthcoming.

In June, Hirsch forwarded Giacometti a document prepared by his attorney, Jeff Pollak, titled "Independent Contractor and Nondisclosure Agreement." The document set forth detailed proposed terms for the equity portion of the agreement. Hirsch sent the email in order to finalize their agreement for Giacometti to join the company. Giacometti did not think that the document accurately reflected the compensation that had been discussed and responded with comments seeking changes and clarification on the equity terms. Over the following weeks, Hirsch and Giacometti continued to negotiate over the terms of Giacometti's equity interest in the company. Hirsch sent Giacometti two additional revised versions of the document, but Giacometti did not agree to any version and never signed the agreement.

3

While the negotiations continued on the independent contractor agreement, Giacometti began work for the company. He was paid $750 per week as CellSavers's interim CTO for 12 weeks. During that time, Giacometti worked on various tasks, including working with a team to build a store for technicians working with the company, improving the company's website conversion rate (i.e. converting visitors of the website to customers), creating customer relationship management processes, and search engine optimization. Giacometti also worked on preparing materials for presentations to potential investors, including an organization chart showing him as the company's CTO.

On October 8, 2015, Giacometti and Hirsch met for lunch. At the meeting, Hirsch told Giacometti that his services were not needed and that the company was parting ways with him. At trial, Giacometti recalled Hirsch telling him at the meeting that CellSavers was no longer financially viable. Hirsch recalled telling Giacometti that his work was not up to par and his services were no longer needed. According to Hirsch, the meeting was amicable, and Hirsch encouraged Giacometti to keep him up to date on another business idea the pair had discussed in the past.

After Giacometti and Hirsch parted ways, a venture capital company, Sequoia Capital, committed a large investment to Puls. Hirsch testified that the term sheet reflecting the investment was signed around November 11, 2015 and the financing was finalized the next month.

On November 29, 2015, Hirsch sent Giacometti an email asking him to remove the position of CellSavers CTO from his LinkedIn profile, stating that "someone asked about it and it created some confusion[.]" On December 6, 2015, Hirsch sent another email to Giacometti memorializing a telephone conversation between them and stating that "[a]s we also discussed on the

4

phone … we did not have any agreement at all regarding either a perpetual role for you in the company or stock/stock options/equity in the company." The email set forth the history of the relationship between Giacometti and CellSavers, and stated that while Hirsch had discussed an equity interest for Giacometti, they had failed to come to a final agreement. Further, the email noted that all versions of the draft agreement they had contemplated "were clear that (1) [the equity] would have only been options [Giacometti] could purchase at price determined by a formula, (2) they would vest over a long period of time, and (3) in order to have the right to purchase such options [Giacometti] would be required to continue to have a business relationship with the company." Hirsch's email also said he would discuss with his co-founder Giacometti's request to keep using the CTO title in order to help his future job prospects. Hirsch closed by wishing Giacometti future success.

Almost two years later, on October 31, 2017, Giacometti filed the instant suit against Puls, CellSavers, and Hirsch. In his complaint, Giacometti asserted claims for breach of contract and fraudulent inducement. Giacometti alleged that the May 20, 2015 email constituted a contract for an equity interest in Puls and that the company breached the contract by denying him that interest after it obtained funding from Sequoia Capital. Giacometti further alleged that Hirsch falsely represented he would provide an equity interest in the company to induce Giacometti to provide services for CellSavers, and that Hirsch terminated Giacometti knowing that equity financing was imminent.

After discovery, the defendants moved for summary judgement or, in the alternative, summary adjudication. The court granted summary adjudication of the breach of contract claim, finding there was no evidence that an agreement for an equity interest had been made because it was

5

undisputed that the letter of intent email was not final and explicitly contemplated a written agreement. The court denied summary adjudication of Giacometti's claim for fraudulent inducement, concluding that whether or not Hirsch had fraudulently induced Giacometti to provide additional services for the company was an issue for the trier of fact.

Thereafter, the parties engaged in additional discovery and related litigation, including a motion to quash or for a protective order against Giacometti's subpoenas to third parties seeking information related to the valuation of Puls. Before trial, the court rejected Giacometti's attempts to obtain this information on the grounds that the appropriate measure of damages for his remaining fraud claims were out of pocket losses, not the lost "benefit of the bargain" that would accompany his rejected breach of contract claim.

The case proceeded to a jury trial on November 4, 2019. During the jury instruction conference, Giacometti moved to amend his complaint to conform to proof to add a claim for false promise. The court granted the motion over Puls's objection. At the close of trial, the jury returned a unanimous special verdict in favor of the defense, thus rejecting Giacometti's claims for intentional misrepresentation (fraudulent inducement) and false promise.

After trial, Giacometti moved for a new trial. One basis for the motion was that the verdict form "did not comport with the CACI verdict forms for intentional misrepresentation and false promise[.]" Giacometti argued that because the form asked the jury if the company or Hirsch made a false representation or false promise "during the hiring process of Simone Giacometti to Simone Giacometti," it improperly limited the jury to consider if fraudulent intent existed only on or before Hirsch sent the May 20, 2015

6

email. The trial court denied the motion, finding that "[t]he qualification in the language of the verdict form that the intentional misrepresentation and/or false promise must have been made 'during the hiring process' was entirely consistent with Giacometti's trial contention, the gravamen of his tort claims being for fraudulent inducement 'during the hiring process.' "

DISCUSSION

I

*Summary Adjudication of Claim for Breach of Contract*

Giacometti first challenges the trial court's order granting summary adjudication of his claim for breach of contract. He argues that a triable issue of fact remained as to whether the May 20, 2015 email constituted an agreement for Giacometti to receive a $150,000 equity interest in Puls. Giacometti also argues the trial court erred by ruling the email could not constitute an agreement as a matter of law because it explicitly contemplated a further agreement. Puls responds that the court correctly determined there was no triable issue of fact concerning the lack of an agreement, and that even if there was error it was cured by the jury's verdict rejecting Giacometti's false promise claim.

A

Our review following an order granting summary adjudication is substantively identical to our review following an order granting summary judgment. (See *Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 367.) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) "A defendant's motion for summary

7

judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. [Citation.] The burden of persuasion remains with the party moving for summary judgment. [Citation.] When the defendant moves for summary judgment, in those circumstances in which the plaintiff would have the burden of proof by a preponderance of the evidence, the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence.' " (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002–1003 (*Kahn*).)

If the defendant "carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar, supra*, 25 Cal.4th at p. 850.) "The plaintiff … shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).)

"We review the record and the determination of the trial court de novo." (*Kahn, supra*, 31 Cal.4th at p. 1003.) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [the plaintiff's] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group* (2001) 25 Cal.4th 763, 768.) "There is a triable issue of material fact if, and

8

only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra*, 25 Cal.4th at p. 850.)

To establish a claim for breach of contract for the equity interest referenced in the May 20, 2015 email, Giacometti was required to establish the existence of an enforceable agreement. "Under basic contract law '[a]n offer must be sufficiently definite, or must call for such definite terms in the acceptance that the performance promised is reasonably certain.' [Citations.] 'Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable. [Citation.]' " (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770 (*Ladas*).)

Put another way "[t]o be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." (*Ladas, supra*, 19 Cal.App.4th at p. 770.) "Whether a contract term is sufficiently definite to be enforceable is a question of law for the court." (*Id*. at p. 770, fn. 2.) Further, "where the parties intend to reduce their agreement to writing there is no binding agreement between the parties until a written contract is signed." (*C. L. Smith Co. v. Roger Ducharme, Inc.* (1977) 65 Cal.App.3d 735, 742.)

B

Contrary to Giacometti's assertions on appeal, the record shows he provided no evidence at the summary adjudication stage establishing a triable issue of material fact with respect to the existence of a contract for an equity interest in Puls. Further, as Puls asserts, Giacometti's trial testimony confirmed that he understood a written agreement would be prepared to

9

finalize the terms of the proposed equity interest, precluding a finding that the email was an enforceable contract.

In his opening brief, Giacometti cites only to one statement in his declaration—that he " 'worked full time for Puls' for the 12 weeks contemplated and was listed as CTO on company documents prepared for investors" —as evidence the email was an enforceable contract giving him an equity interest valued at $150,000. This statement, however, does not show a triable issue of material fact concerning the existence of the contract. (See *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 ["The parties' undisclosed intent or understanding is irrelevant to contract interpretation."].) Rather, it is evidence that Giacometti went to work for Puls. It does not contradict the evidence submitted by Puls showing the parties never came to an agreement with respect to the proposed equity interest. That evidence included the May 20, 2015 email itself, which stated Giacometti could expect an agreement from Puls's attorney; Giacometti's response asking if the agreement should include Vedilo; and Giacometti's rejection of three drafts of the agreement and engagement in negotiation of its final terms. This evidence showed, as a matter of law, that there was no meeting of the minds with respect to the equity interest.

In addition, Giacometti's testimony at trial confirmed his understanding that the equity interest would be set forth in a written agreement following the May 20, 2015 email. Giacometti stated he understood a written agreement was forthcoming and that he engaged in continued negotiations with Hirsch, primarily over the vesting period for the equity, in the weeks following the email. Further, there is no dispute that the agreement concerning the proposed equity interest was never finalized.

10

On this record, Giacometti cannot show the court's summary adjudication of his breach of contract claim was error.

Giacometti relies on *J.B.B. Investment Partners Ltd. v. Fair* (2019) 37 Cal.App.5th 1 (*J.B.B.*) to support his assertion that the court erred by concluding as a matter of law there was no agreement because the May 20, 2015 email contemplated a further agreement. He also cites *Blix St. Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39 (*Blix*) for the same proposition. Neither case supports reversal here.

In *J.B.B.*, the plaintiffs, investors in an alleged Ponzi scheme, threatened litigation if the defendant companies did not accept a proposed settlement contained in an email. (*J.B.B., supra*, 37 Cal.App.5th at pp. 9–11.) The email set forth ten detailed terms of the settlement and stated only a yes or no answer, and no counteroffer, would be accepted. (*Id*. at p. 9.) The following day, hours after the plaintiffs filed their complaint, the defendants' counsel responded unequivocally that defendants agreed to the offer. (*Id*. at p. 10.) The trial court rejected defendants' argument that no contract was formed and granted the plaintiffs' motion for summary adjudication of their claim the defendants had breached the settlement agreement. (*Id*. at p. 7.) The defendants appealed, arguing a triable issue of material fact remained as to whether the parties entered a binding settlement agreement. (*Ibid*.)

The Court of Appeal rejected the challenge, holding the trial court's ruling was correct because the parties' communications " 'permit only one reasonable conclusion—the parties agreed to a binding settlement[.]' " (*J.B.B., supra*, 37 Cal.App.5th at p. 11.) The court rejected the defendants' argument that because plaintiffs followed the email exchange with a more formal agreement that included additional standard contractual language, the earlier agreement was rendered invalid. (*Id*. at p. 12.) The offer,

11

described in the email as plaintiffs' " 'FINAL OFFER[,]' … 'included specific terms (settlement amount, payment deadline, release of claims, etc.) delineated in 10 separately numbered paragraphs, which expressly invited defendants' acceptance.' " (*Id*. at p. 13.) Unlike the May 20, 2015 email, the *J.B.B.* settlement offer email contained the agreement's material terms, which "were unambiguous and clear, and therefore enforceable." (*Ibid*.) The *J.B.B.* email also expressed clearly it was intended to settle the claims at issue and that its acceptance constituted an agreement to settle. (*Id*. at p. 13.) In contrast here, the May 20, 2015 email and the communications between Hirsch and Giacometti that followed, showed unequivocally the parties' intent to finalize the proposed equity interest by way of a formal agreement prepared by Puls's lawyer. If anything, *J.B.B.* supports the trial court's conclusion that no final agreement with respect to the proposed equity agreement was reached on May 20, 2015.

*Blix* involved the enforcement of a settlement agreement by way of judicial estoppel. (*Blix, supra*, 191 Cal.App.4th at p. 41.) The settlement agreement was reached on the eve of trial, and at the readiness conference the parties represented to the court that the lawsuit was settled. Shortly after, one party changed course and rejected the agreement. (*Id*. at pp. 42–45.) At the time counsel told the court a settlement had been reached, however, the party did not object or raise any concern. (*Id*. at p. 49.) The "settlement agreement itself recited that it was enforceable[.]" (*Ibid*.)

An argument advanced by the party challenging the settlement was that there was no expectation reliance by the trial court because the parties contemplated a future "long-form agreement." (*Blix, supra*, 191 Cal.App.4th at p. 43.) In upholding the trial court's determination that the settlement agreement was enforceable through principles of judicial estoppel, the Court

of Appeal noted that "[w]hen parties intend that an agreement be binding, the fact that a more formal agreement must be prepared and executed does not alter the validity of the agreement." (*Id.* at p. 48.) Giacometti relies on this language to support his position. *Blix*, however, is inapposite. In addition to the important distinction that enforcement of the agreement there was based on judicial estoppel, not mutual assent, the case involved an agreement the parties *intended to be binding*. No evidence in this case showed such an intent with respect to the May 20, 2015 email.

In sum, the trial court's determination that there was no triable issue of material fact as to whether the May 20, 2015 constituted an enforceable contract was not error.

## II

### *Alleged Instructional Error*

Giacometti next asserts reversal of the judgment is required because the special verdict form contained an erroneous statement of the law and "did not comport with the CACI verdict forms for intentional misrepresentation." Puls responds that Giacometti forfeited this issue because he did not object to the form before the jury rendered its verdict. Puls also asserts that even if the argument was not forfeited, there was no error because the form did not restrict the jury in the manner Giacometti contends.

### A

" 'Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected.' " (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 263–264, italics omitted.) " 'The obvious purpose for requiring an objection to a defective verdict before a jury

13

is discharged is to provide it an opportunity to cure the defect by further deliberation. [Citation.]' " (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242.) "The rule is designed to advance efficiency and deter gamesmanship." (*Keener v. Jeld-Wen, Inc.,* at p. 264.)

" ' " ' "In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " ' " (*Keener v. Jeld-Wen, Inc., supra*, 46 Cal.4th at pp. 264–265.)

### B

The special verdict form for Giacometti's claim of intentional misrepresentation, which covered the fraudulent inducement cause of action pled in the complaint, contained six questions. The first question asked the jury, "Did Puls Technologies, Inc. and/or Itai Hirsch intentionally make a false representation during the hiring process of Simone Giacometti to Simone Giacometti. [ ] ____ Yes ____ No." The jury answered the question "No," rendering a defense verdict and eliminating the need to answer the remaining questions for that claim.

The verdict forms were discussed at a conference the afternoon before the close of evidence.[2] When the discussion of jury instructions was completed, the discussion turned to the verdict forms. Both parties submitted versions of the verdict forms to the court. Giacometti's counsel

---

[2]    The court noted at the outset of the reported portion of the conference that there had been "a lot of discussions about jury instructions off the record" and that it had "made rulings off the record[.]"

14

advocated for using the standard CACI forms for each claim, while Puls's counsel proposed the special verdict forms that became the basis for the forms ultimately used.[3]

The discussion of which forms to use centered on whether to merge the two claims into one special verdict form and what measure of damages applied to each claim. The defense argued there was no difference between the fraudulent misrepresentation claim and the false promise claim, thus one form was sufficient. Giacometti's counsel disagreed and asserted that the claims should be separately evaluated by the jury. During the conference, Giacometti's counsel did not raise any objection to the first question on the form for intentional misrepresentation that he now challenges on appeal.

After the verdict, in his motion for a new trial, Giacometti asserted for the first time that the verdict form for intentional misrepresentation was contrary to the law because it suggested fraudulent intent could only be measured as of May 20, 2015. In support of his assertion that the issue had been raised during the jury instruction conference, Giacometti's motion quoted his counsel's statements during the discussion of the defense's motion in limine to limit the testimony of Giacometti's damages expert who was testifying the following day. During the colloquy, Giacometti's counsel explained that the fraud based on false promise was completed, and damages were thus incurred, only once Sequoia Capital funded Puls. The quoted discussion contained no mention of whether the form improperly limited the jury's evaluation of when the alleged intentional misrepresentation was made, the issue Giacometti raises here. Indeed, Giacometti's appellate briefs

---

[3]    The record contains proposed verdict forms submitted in the joint trial conference report, but does not appear to include the versions of the verdict forms discussed at the conference.

do not specifically identify any objection to the verdict form on this basis *before* the jury rendered its verdicts.

On this record, we agree with Puls that Giacometti forfeited the issue he asserts on appeal by failing to raise it in a timely manner in the trial court. Accordingly, we reject this challenge to the jury's verdict.

## DISPOSITION

The summary adjudication order and judgment are affirmed. Appellant to bear the costs of appeal.

McCONNELL, P. J.

WE CONCUR:

BENKE, J.

IRION, J.

16